## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.:

BENJAMIN F. OWENS and
CYNTHIA A. OWENS,

              Plaintiffs,

v.

WRIGHT MEDICAL TECHNOLOGY, INC.,
a Delaware Corporation,

              Defendant.

---

## COMPLAINT AND JURY DEMAND

---

## <u>THE PARTIES</u>

1.      Plaintiff Benjamin F. Owens resides in Loma, Mesa County, Colorado, and is a citizen of the State of Colorado.

2.      Plaintiff Cynthia A. Owens resides in Loma, Mesa County, Colorado, and is a citizen of the State of Colorado.

3.      At all times relevant hereto, Plaintiffs Benjamin F. Owens and Cynthia A. Owens were and are legally married to each other and reside together as husband and wife in Mesa County, Colorado.

4.      Defendant Wright Medical Technology, Inc., is a Delaware corporation with its principal place of business at 1023 Cherry Road, Memphis, Tennessee 38117, and at all times relevant hereto, was engaged in the business of designing, manufacturing, distributing, selling, marketing and/or introducing into interstate commerce, either directly or indirectly through third-

parties or related entities, various prosthetic orthopedic products, including the Wright Medical Profemur Hip products that are in issue in this civil action.

5.      Defendant Wright Medical Technology, Inc., is a Delaware corporation with its principal place of business at 1023 Cherry Road, Memphis, Tennessee 38117, and as such is deemed to be a citizen of the state of Delaware and the State of Tennessee.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) as the parties are citizens of different States, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) and (c), as a substantial part of the events giving rise to this claim occurred in the State of Colorado.

## FACTUAL ALLEGATIONS

8.      At all times relevant to the issues alleged in this Complaint Defendant Wright Medical Technology, Inc., is or was a wholly owned subsidiary of Wright Medical Group, Inc., which now is or was a subsidiary or other corporate affiliate of Wright Medical Group N.V.

9.      Stryker Corporation is a Michigan Corporation with his principal place of business located at the address of 2825 Airview Boulevard Kalamazoo, Michigan 49002.

10.      On November 11, 2020, Stryker Corporation announced that it completed the previously announced acquisition of Wright Medical Group N.V.

11.      In December 1999, Wright Medical Group Inc., acquired a European manufacturer of artificial hip devices known as Cremascoli Ortho ("Cremascoli") which had designed and manufactured artificial hips with a modular neck component since approximately the year 1985.

12.     In the Form 10-K filed by Wright Medical Group, Inc. with the United States Securities and Exchange Commission for the fiscal year ended December 31, 2001, Wright Medical Group, Inc. states:

> Wright Medical Group, Inc. (the "Company") is a global orthopaedic device company specializing in the design, manufacture and marketing of reconstructive joint devices and bio-orthopaedic materials.

13.     In the Form 10-K filed by Wright Medical Group, Inc. with the United States Securities and Exchange Commission for the fiscal year ended December 31, 2001, Wright Medical Group, Inc. states:

> [O]n December 22, 1999, the Company acquired Cremascoli Ortho Group ("Cremascoli"), based in Toulon, France.

14.     In the Form 10-K filed by Wright Medical Group, Inc. with the United States Securities and Exchange Commission for the fiscal year ended December 31, 2001, Wright Medical Group, Inc. states:

> Through the Company's acquisition of Cremascoli, several hip implant products designed for the European market, including the . . . PROFEMUR-TM-R Hip System, were acquired. . . . The PROFEMUR-TM- R hip stem is a revision replacement implant with a patented modular femoral neck component. . . .

15.     After the acquisition of Cremascoli, Wright Medical expanded the Profemur modular artificial hip stem and modular neck product line.

16.     After the acquisition of Cremascoli, Wright Medical branded what is at times referred to by Wright Medical as the Wright Medical Profemur® Total Hip System.

17.     The first prototype series of the titanium Profemur modular necks was produced in 1985 by Cremascoli.

18.     The Cremascoli patented titanium alloy (Ti6Al4V) Profemur modular necks were first marketed in 1986.

19.     Based on the original Patent Documents of Cremascoli, it appears that there was a change in the design [re-design] of the titanium Profemur modular necks sometime after Wright Medical Group, Inc., acquired Cremascoli in 1999, and before these products were first distributed in the United States.

20.     The Wright Medical Group, Inc., re-designed titanium Profemur modular neck is the design of the Profemur modular neck which was distributed by Wright Medical in the State of Colorado, and elsewhere in the United States.

**General Allegations as to Profemur Modular Necks**

21.     Pursuant to the Section 510(k) Premarket Notification Process, on December 13, 2000, Wright Medical received clearance from the United States Food and Drug Administration (FDA) to distribute in the United States its Pro-Femur R Revision Hip System, and the accompanying twelve versions of its titanium Profemur Modular Necks, [K003016].

22.     Pursuant to the Section 510(k) Premarket Notification Process, on July 2, 2002, Wright Medical received clearance from the United States Food and Drug Administration (FDA) to distribute in the United States its STEM Hip Replacement System.

23.     The stem that is the subject of K021346 subsequently was branded by Wright Medical as the Profemur Z Hip Stem.

24.     The devices the FDA cleared Wright Medical to distribute by way of the above-referenced 510(k) process, K003016 and K021346, included twelve "versions" of titanium modular necks for use with these devices that were branded by Wright Medical as its titanium Profemur® modular necks.

25.     The FDA itself did not test the safety or efficacy of the Profemur R Revision Hip System stem, nor the accompanying titanium Profemur modular necks as a part of the 510(k) process for K003016.

26.     The FDA itself did not test the safety or efficacy of the Stem Hip System stem, nor the accompanying titanium Profemur modular necks as a part of the 510(k) process for K021346.

27.     In the 510(k) process the FDA reviews the submission and representations of Wright Medical about the product and concluded that these Profemur devices were substantially equivalent to other already legally marketed devices.

28.     In the Wright Medical 510(k) applications, none of the other products that Wright Medical represented to be the substantial equivalents of its Profemur devices were hip stems with a titanium modular neck.

29.     Sometime after December 13, 2000, Wright Medical began to import, manufacture, label, market, promote, distribute and sell in the United States the Wright Medical Pro-Femur R Revision Hip System, including the twelve titanium Profemur modular necks.

30.     Sometime after July 2, 2002, Wright Medical began to import, manufacture, label, market, promote, distribute and sell in the United States the Wright Medical STEM Hip System, a/k/a the Profemur Z Hip System, including the twelve titanium Profemur modular necks.

31.     The Profemur Z hip stem is not a plasma coated hip stem.

32.     Wright Medical subsequently designed and manufactured a plasma coated Profemur Z hip stem, which it branded as the Profemur Z Plasma hip stem, and/or the Profemur Plasma Z hip stem.

33.     Wright Medical has never received a 510(k) clearance to distribute in the United States the Profemur Plasma Z hip stem for use with titanium Profemur Modular Necks.

34.     The Wright Medical Profemur modular necks, as promoted, marketed, distributed and sold in the United States after December 13, 2000, and before August 25, 2009, for use with various Wright Medical hip stems, were manufactured in various models or styles, six of those were generally identified by Wright Medical as "short" necks (i.e., Ref. #s PHA0-1202, PHA0-1212, PHA0-1222, PHA0-1232, PHA0-1242, and PHA0-1252), and six were generally identified by Wright as "long" necks (i.e., Ref. #s PHA0-1204, PHA0-1214, PHA0-1224, PHA0-1234, PHA0-1244, and PHA0-1254).

35.     In various marketing and informational material published and distributed by Wright Medical from approximately the year 2002, and into the year 2005, and available to Wright Medical's sales representatives and distributors, surgeons, patients and the general public, Wright Medical made the following representations, statements, claims and guarantees about its Profemur modular necks:

> The modular neck used with the Profemur Hip has been employed by Wright Cremascoli for over 15 years.  The necks were designed in 1985 and have been successfully implanted in over 50,000 patients requiring both primary and revision hip procedures.  The necks are used in other Wright Cremascoli hip systems besides the Profemur Hip.  None of the necks has experienced a clinical failure since their inception.

[e.g., Wright Medical Technical Monograph MH688-102 ©2002, and © 2004.]

36.     In various marketing and informational material published and distributed by Wright Medical from approximately the year 2002, and into the year 2005, and available to Wright Medical's sales representatives and distributors, surgeons, patients and the general public, Wright Medical made the following representations, statements, claims and guarantees about its Profemur modular necks:

> The modular neck system, designed by Cremascoli in 1985 (U.S. Patent # 4,957,510), has now been successfully implanted in over 50,000 patients requiring

both primary and revision hip arthroplasty.  Extensive laboratory tests have proven that the coupling between the modular neck and femoral implant guarantees:

- Structural reliability
- Absence of significant micromovement
- Absence of fretting corrosion

[e.g., Wright Medical Technical Monograph MH688-102 ©2002, and © 2004.]

37.     In various marketing and informational material published and distributed by Wright Medical from approximately the year 2002, and into the year 2010, and available to Wright Medical's sales representatives and distributors, surgeons, patients and the general public, Wright Medical made representations, statements, and claims about its Conserve®, Lineage®, and Profemur® hip product lines that these products were intended for patients who wanted to return to an active lifestyle.

38.     In various marketing and informational material published and distributed by Wright Medical from approximately the year 2002, and into the year 2012, and available to Wright Medical's sales representatives and distributors, surgeons, patients and the general public, Wright Medical made representations, statements, and claims about its Conserve®, Lineage®, and Profemur® hip product lines that these products were intended for patients who wanted to return to an "active lifestyle."

39.     In various marketing and informational material published and distributed by Wright Medical from approximately the year 2002, and into the year 2012, and available to Wright Medical's sales representatives and distributors, surgeons, patients and the general public, Wright Medical made representations, statements, and claims about its Conserve®, Lineage®, and Profemur® hip product lines that these products were intended for patients who wanted to return to and engage in various sporting, athletic, and lifestyle activities, such as golf, tennis, running, dirt bike racing, wrestling, active military duty, karate, and heavy labor.

40.     In various marketing and informational material published and distributed by Wright Medical from approximately the year 2002, and into the year 2012, and available to Wright Medical's sales representatives and distributors, surgeons, patients and the general public, Wright Medical made representations, statements, and claims about its Conserve®, Lineage®, and Profemur® hip product lines that these products were expected to last 10 to 15 years.

41.     In marketing its Conserve®, Lineage®, and Profemur® hip product lines to surgeons, Wright Medical sales representatives made representations to surgeons that Wright Medical Conserve®, Lineage®, and Profemur® hip products were expected to last at least 20 years.

42.     Within the modular necks which Wright Medical represented in literature it created and distributed in the United States for its first marketing of these devices, into the year 2005, as having been "designed by Cremascoli in 1985," and "successfully implanted in over 50,000 patients," were thousands of the original modular neck design that existed prior to the re-design by Wright Medical.

43.     Prior to the year 2002, Cremascoli and Wright Medical had received notice of clinical failures in the form of fractures of its (Cremascoli) modular necks that had been "designed by Cremascoli in 1985."

44.     In the year 2002, Wright Medical received notice of clinical failures in the form of fractures of its (Cremascoli) modular necks that had been "designed by Cremascoli in 1985."

45.     In the year 2003, Wright Medical received notice of clinical failures in the form of fractures of its (Cremascoli) modular necks that had been "designed by Cremascoli in 1985."

46.     In the year 2004, Wright Medical received notice of clinical failures in the form of fractures of its (Cremascoli) modular necks that had been "designed by Cremascoli in 1985."

47.     In the year 2005, Wright received notice of clinical failures in the form of fractures of its (Cremascoli) modular necks that had been "designed by Cremascoli in 1985."

48.     In its 510(k) Premarket Notification applications to distribute its titanium Profemur modular necks in the United States, Wright Medical did not disclose to the FDA that there had been clinical failures in the form of fractures of its (Cremascoli) modular necks "designed by Cremascoli in 1985."

49.     Once Wright Medical filed a 510(k) Premarket Notification application to distribute its Profemur modular necks in the United States, Wright Medical had a duty to report to the FDA any instances it knew of, or received notice of, that was reported to it to be a clinical failure in the form of a fracture of a modular neck that had been implanted in a patient.

50.     Once Wright Medical received clearance to distribute titanium Profemur modular necks in the United States as a result of its 510(k) Premarket Notification application, Wright Medical had a duty to report to the FDA any instances it knew of, or received notice of, that was reported to it to be a clinical failure in the form of a fracture of a modular neck that had been implanted in a patient.

51.     Prior to January of 2005, Wright Medical knew of or received notice of clinical failures in the form of fractures of its modular necks that had been "designed by Cremascoli in 1985" and implanted in patients outside of the United States.

52.     Prior to April 19, 2005, Wright Medical did not report to the FDA any of the instances it knew of or received notice of that a Profemur modular neck had clinically failed by the modular neck having fractured in a patient outside the United States.

53.     On or about April 19, 2005, Wright Medical first reported to the FDA a Profemur modular neck clinical failure where a modular neck implanted in a patient had fractured at its oblong taper, where the oblong taper seats in the pocket of the stem.

54.     After receiving notice of a 2005 Profemur modular neck fracture, Wright Medical received notice of additional Profemur modular neck clinical failures where the modular neck implanted in a patient had fractured at its oblong taper, where the oblong taper seats in the pocket of the stem.

55.     The number of titanium Profemur modular neck clinical failures, in the form of fractures at its oblong taper, where the oblong taper seats in the pocket of the stem, has continued to increase over time, and continues to increase to the present day, now numbering more than 700 such modular neck fractures, according to data reported in the FDA MAUDE database.

56.     Both the long and the short versions of the titanium Profemur modular necks have been reported in the MAUDE Database to have fractured at its oblong taper, where the oblong taper seats in the pocket of the stem.

57.     The number of fracture reports in the MAUDE Database for the six versions of titanium Profemur long modular necks is significantly higher than the number of fracture reports of the six versions of titanium Profemur short modular necks.

58.     The number of fractures known to Wright Medical for the six versions of titanium Profemur long modular necks is significantly higher than the number of fractures reports of the six versions of titanium Profemur short modular necks.

59.     The rate of fracture ["rate of fracture" being the number reported to have fractured as a percentage of the number distributed] of the six versions of titanium Profemur long modular

necks is significantly higher than the number of fracture reports of the six versions of titanium Profemur short modular necks.

60.     Wright Medical did not inform orthopedic surgeons in the United States known by it to have implanted its titanium Profemur modular necks of the reports it had received of titanium modular necks fracturing, nor did it voice any concerns to those surgeons about fractures of its titanium Profemur modular necks, until a December 1, 2008, "Safety Alert" was sent by Wright Medical to certain "medical professionals," which provided, in part, "[W]e have received reports of 35 modular neck failures as of November 21, 2008.  Initial investigations have revealed several commonalities in these failures: heavyweight males, long modular necks and patient activities such as heavy lifting and impact sports."

61.     At the time Wright sent its December 1, 2008 Safety Alert, Wright Medical in fact was aware of more than 35 titanium modular neck failures (by fracture of the modular neck) as of November 21, 2008, if all of the titanium modular neck fractures known to Wright Medical and Cremascoli modular necks that had occurred in patients going back to the original design and distribution in 1985 had been included in the total number of clinical failures.

62.     The FDA Guidance Documents for Femoral Stem Prostheses DRAFT, dated August 1, 1995, available to industry at the time Wright Medical submitted its 510(k) clearance application for the Profemur R Revision Hip System, including the titanium Profemur Modular Necks, the section titled "Contraindicated Weight Limit(s)", stated, in part, "labeling by contraindication as not for use in patients above a certain weight."

63.     In Wright Medical's Instructions for Use [hereinafter "IFU"] that accompanied the Profemur hip devices distributed in the United States from the date of their introduction into the

United States, through June of 2009, Wright stated the use of these devices to be contraindicated in "obese" patients, "[W]here obesity is defined as three times normal body weight."].

64.     Prior to August 2010, Wright Medical did not, in its IFUs for the Profemur hip devices distributed in the United States, include a warning, precaution or other advisory as to the use of any of its Profemur modular necks in people who weighed more than any specifically stated patient body weight or had a body mass index (BMI) of any particular number or higher.

65.     Prior to August 2010, Wright Medical did not state in its IFUs for the Profemur hip devices distributed in the United States that the use of any of its modular necks was contraindicated in heavyweight males.

66.     Prior to August 2010, Wright Medical did not state in its IFUs for the Profemur devices distributed in the United States that the use of any of its modular necks was contraindicated in patients who engaged in heavy lifting.

67.     Prior to August 2010, Wright Medical did not state in its IFUs for the Profemur devices distributed in the United States that the use of any of its modular necks was contraindicated in patients who engaged in impact sports.

68.     In the marking of its artificial hips, sales representatives trained by Wright Medical represented to surgeons that its Conserve®, Lineage®, and Profemur® artificial hips had a life expectancy of 20 years or more.

69.     Even though some Wright IFUs for the Profemur devices in use prior to August 2010 contained a section titled, "Conditions presenting increased risk of failure include," that section of the IFU did not state that patients weighing more than a certain patient body weight, or with a BMI of a certain number or higher, engaging in a high level of physical activity, engaging in heavy lifting, or engaging in impact sports, would be at an increased risk of failure (fracture) of

the modular neck component, when compared to other Wright Medical hip devices using that same IFU that did not have modular necks.

70.     Even though some Wright IFUs for the Profemur devices in use prior to August 2010 contained a section titled "Warning," and a subsection within titled "Modular Necks," Wright Medical did not state therein that patients weighing more than a certain patient body weight, or with a BMI of a certain number or higher, engaging in a high level of physical activity, engaging in heavy lifting or engaging in impact sports, would be at an increased risk of failure (fracture) of the modular neck, compared to other Wright Medical hip devices using that same IFU that did not have modular necks.

71.     Even though some Wright IFUs for the Profemur hip devices in use prior to August 2010 contained a section titled "General Product Information," that stated, "An overweight or obese patient can produce high loads on the prostheses, which can lead to failure of the prosthesis," and, "If the patient is involved in an occupation or activity which includes substantial walking, running, lifting, or muscle strain, the resultant forces can cause failure of the fixation of the device, or both," Wright Medical did not state that patients involved in an occupation or activity that included those activities created any higher risk of failure than would exist in any other design of artificial hip stem without a modular neck, or compared to other Wright Medical hip devices using that same IFU that did not have modular necks.

72.     Wright Medical did not change the language in its IFUs for its Profemur devices distributed in the United States discussing the issue of any specific patient body weight or activity levels as they may relate to modular neck fractures until August 2010, if not later.

73.     On or after August 25, 2009, Wright Medical began distributing in the United States Profemur modular necks made of a cobalt chrome alloy [CoCr].

74.     The engineering processes and technology to make Profemur modular necks out of a cobalt chrome alloy was available and feasible in the year 2001.

75.     The production of Profemur modular necks out of a cobalt chrome alloy [CoCr], rather than the Ti6A14V alloy, does not significantly increase the cost to Wright Medical to manufacture a modular neck.

76.     The manufacture of Profemur modular necks out of a cobalt chrome alloy by Wright Medical did not result in a substantial increase in the cost of purchasing the product by the consumer, compared to the cost of a titanium modular neck.

77.     When Wright Medical began to distribute Profemur modular necks made of cobalt chrome, the amount Wright Medical charged for a CoCr Profemur modular neck was approximately the same price as a titanium Profemur modular neck of the same version, [i.e., a PHAC-1254 (CoCr Profemur modular neck) is the same "version" as a PHA0-1254 (Ti Profemur modular neck)].

78.     Wright Medical CoCr Profemur modular necks distributed in the United States were made in the same six long versions, and the same six short versions, as the six long and six short versions of the Ti6A14V Profemur modular necks.

79.     Wright Medical CoCr Profemur modular necks distributed in the United States have the same geometry [i.e., dimensions] for its proximal trunnion, and the distal oblong taper, as the Ti6A14V Profemur modular necks, making the CoCr Profemur Modular necks mechanically compatible for assembly with the same Wright Medical femoral heads and hips stems that the titanium Profemur modular necks were compatible with.

80.     Wright Medical CoCr Profemur modular necks are less susceptible to fatigue fracture at the neck-stem junction than the otherwise similar versions or models of Ti6Al4V Profemur modular necks.

81.     After implantation, Wright Medical CoCr Profemur modular necks are less likely to fail by a fracture at the neck-stem junction from cyclic loading and metal fatigue than the otherwise identical version or model of Ti6A14V Profemur modular necks.

82.     In 2012 Wright Medical published a brochure that states, "Product complaint data reported to Wright to date does not indicate an increased risk, as compared to traditional titanium necks, of adverse events due to taper junction fretting and corrosion or fractures for Profemur® CoCr Modular.  (Profemur® CoCr Modular Necks Frequently Asked Questions, MH619-812 © 2012.)

83.     After approximately ten years of clinical experience with the implantation of Wright Medical CoCr Profemur modular necks in Wright Medical Profemur stems, the rate of reported clinical failures by a fatigue fracture of each version of the CoCr Profemur modular necks, is significantly less than the rate of reported clinical failures by a fatigue fracture of each comparable version of the Titanium Profemur modular necks. ["rate of fracture" being the number reported to have fractured as a percentage of the number distributed.]

84.     The production of Profemur modular necks out of a cobalt chrome alloy, rather than the Ti6A14V alloy, is not known to Wright Medical to significantly increase the risk of failure of the hip arthroplasty from other known potential medical complications, such as metallosis, aseptic lymphocytic vasculitis-associated lesions (ALVAL), adverse local tissue reaction (ALTR), or aseptic loosening of the acetabular component.

85.    Patient Testimonials, also at times called "Patient Stories," that previously appeared on the Wright Medical website and were available to Wright Medical sales representatives, distributors, physicians, patients, and the public from the years 2005 into the year 2012, and/or that appeared in printed materials published by Wright Medical from 2005 into the year 2012, represented that patients who received Wright Medical artificial hips have already returned or are about to return to such activities as running, jogging, snow skiing, water skiing, marathon running, tennis, racquetball, golf, horseback riding, work that involves lifting and moving of heavy objects, active military duty in Iraq, karate, competitive wrestling and competitive motocross racing, among other activities.

86.    Some of the Patient Testimonials, also at times called "Patient Stories," that previously appeared on the Wright Medical Website, and in printed materials published by Wright Medical from 2005 into the year 2012, have been from men who received the titanium Profemur modular neck and weighed in excess of 250 pounds.

87.    It is now known to Wright Medical that some patients who have given Patient Testimonials, also at times called "Patient Stories," that have at times appeared on the Wright Medical Website, and in printed materials published by Wright Medical from 2005 into the year 2012, have been from a patient who received the titanium Profemur modular neck and subsequently experienced a fracture of the titanium modular neck of their device.

88.    Brad L. Penenberg, M.D., is an orthopedic surgeon in Beverly Hills, California who for a time had an agreement with Wright Medical to be what is known in the industry as a "key opinion leader" (KOL) for Wright Medical.

89.    In a "webinar" sponsored by Wright Medical that was intended to be viewed by orthopedic surgeons, Brad L. Penenberg, M.D., discussed Wright Medical Profemur devices, and

patient selection, and states that he did not place restrictions on the post-recovery activities of his patients who received these devices, and that they may return to activities and lifestyles that include such things as tennis, horseback riding and snow skiing.

90.     Orthopedic surgeons who authored portions of "Surgical Technique" publications produced by Wright Medical for various Profemur devices, and distributed by Wright Medical, and sales representatives trained by Wright Medical, have had patients who have now suffered fractures of the titanium Profemur modular necks of the devices they implanted.

91.     Orthopedic surgeons who authored portions of "Technical Monograph" publications produced by Wright Medical for various Profemur devices, and distributed by Wright Medical, and sales representatives trained by Wright Medical, have had patients who have now suffered fractures of the titanium Profemur modular necks of the Profemur devices they implanted.

92.     Orthopedic surgeons who were what is known in the medical device community as "Key Opinion Leaders" for Wright Medical have had patients who have now suffered fractures of the titanium Profemur modular necks of the devices they implanted.

93.     Orthopedic surgeons who, at the request of Wright Medical, demonstrated the implantation of titanium Profemur modular necks by having other surgeons observe them in actual artificial hip implantation surgery, have patients who have now suffered fractures of the titanium Profemur modular necks of the devices they implanted.

94.     Wright Medical's long titanium Profemur modular neck products have had clinical failures, in the form of sudden catastrophic structural failure of the modular neck, as the result of fatigue fractures of the titanium modular neck oblong taper in the pocket of a Profemur stem, at a rate significantly higher than Wright expected when it first began to market and distribute these devices in the United States.

95.     Notwithstanding Wright Medical's knowledge, Wright Medical has never informed patients in the United States who received its long titanium Profemur modular necks, and have not yet experienced a modular neck fracture, that its titanium Profemur modular neck products are experiencing higher than anticipated rates of failure due to fracture of the modular neck.

96.     Notwithstanding Wright Medical's knowledge, Wright Medical has never informed patients in the United States who received its long titanium Profemur modular necks, and have not yet experienced a modular neck fracture, that higher patient weight, or higher levels of activity, may place patients at an increased risk and rate of failure due to fracture of the modular neck.

97.     Notwithstanding Wright Medical's knowledge, Wright Medical has never instructed Wright Medical sales representatives, or Wright Medical distributors, to inform any surgeons known to have implanted its titanium Profemur long modular necks that since the original 35 failures it reported in its December 1, 2008 Safety Alert, the number of reported fractures of Wright Medical long titanium modular necks has continued to increase, that a significant percentage of the fractures have occurred in patients who were not "heavyweight males," that a significant number of the fractures that have occurred have been in patients who were not "heavyweight" i.e., weighed more than 230 lbs.

98.     Notwithstanding Wright Medical's knowledge, Wright Medical has never informed all of the surgeons known to it to have implanted its titanium Profemur modular necks that since the original 35 failures it reported in its December 1, 2008 Safety Alert, the number of reported fractures of Wright Medical titanium modular necks has continued to increase, that a significant percentage of the fractures have occurred in patients who were not "heavyweight males," that a significant number of the fractures that have occurred have been in patients who were not

"heavyweight (>230 lbs.)," or that fractures are occurring with short necks coupled with a femoral head with a long collar.

99.    Notwithstanding Wright Medical's knowledge, subsequent to its December 1, 2008 Safety Alert, Wright Medical has never informed all of the surgeons known to it to have implanted its titanium Profemur modular necks of the number of titanium modular neck fractures that it has notice of, the rate of fracture of the various versions of its various titanium Profemur modular necks, or the projected number or rate of fractures that Wright Medical expects for these products.

100.    Notwithstanding Wright Medical's knowledge, subsequent to December of 2010, Wright Medical has not conducted a study or investigation to determine the estimated projected future number of titanium modular neck fractures or the projected future rate of fractures of the various versions of its various titanium Profemur modular necks.

101.    Notwithstanding Wright Medical's knowledge, Wright Medical has never requested all surgeons in the United States known to it to have implanted Wright Medical long titanium Profemur modular necks to inform all of their patients who received Wright Medical titanium Profemur modular necks that patients Wright Medical considers to be "heavyweight" (>230 lbs.), who engage in high impact sports, or carry heavy weights, are at an increased risk and rate of failure due to fracture of the modular neck than was known, expected, and had disclosed by Wright Medical to their surgeon at the time their Wright Medical Profemur hip was implanted.

102.    Notwithstanding Wright Medical's knowledge, Wright Medical has never requested all hospitals in the United States known to it to have sold Wright Medical titanium Profemur modular necks to inform all patients who purchased long titanium Profemur modular necks from their hospital that patients Wright Medical considers to be "heavyweight" (>230 lbs.), who engage in high impact sports, or carry heavy weights, are at an increased risk and rate of

failure due to fracture of the modular neck than was known, expected, and had disclosed by Wright Medical to the hospital that provided them their Wright Medical Profemur hip.

103.    Under certain reasonably foreseeable circumstances, the sudden fracture of a person's Wright Medical titanium Profemur modular neck could result in their death.  [For example: If the titanium modular neck suddenly fractures when the person is climbing a ladder to clean the gutters on their home, they could fall and be killed.  Or, if the modular neck suddenly fractures when the person is fly-fishing alone in thigh deep water, they could fall and drown.]

104.    The recipients of Wright Medical titanium Profemur long modular necks have a right to know that they are at an increased risk of sudden catastrophic failure by fracture of the modular neck component of their Wright Medical Profemur hip, compared to the risk of such fracture that was known by Wright Medical and disclosed by Wright Medical at the time of the implantation of that device.

105.    Since the implantation of Plaintiff with his Wright Medical Profemur Modular Necks, Wright Medical Profemur Modular Necks have continued to fail by fracture as a result of micromotion and fretting corrosion.

106.    Within the United States, there have been at least 349 Long and X-Long Titanium modular neck fractures among 15,786 United States sales, representing a cumulative rate of modular neck device fracture with a fracture rate in the United States of at least 2.21% from 2002 to 2019.

107.    The cumulative rate of long modular neck device fracture, when mated with a Profemur Plasma Z Stem, is in excess of 10.00% from 2002 to 2019.

108.     As of September 18, 2020, within the United States, there was an average time of 5.4 years to device fracture after implantation for the Profemur Long and X-Long Titanium modular necks.

109.     On September 18, 2020 a Class 1 Device Recall of Profemur Long and X-Long necks was posted on the publicly accessible website of the United States Food and Drug Administration [FDA], https://www.accessdata.fda.gov.

110.     That FDA Class 1 Recall states, in part:

Surgeons:

1.   Please immediately cease use of these products.

2.   You can continue to monitor your patients per your normal protocol.  There are no diagnostic techniques which can predict an unexpected postoperative failure.

### PLAINTIFF BENJAMIN F. OWENS' PROFEMUR HIPS

111.     On October 16, 2006 Plaintiff Benjamin F. Owens had a Wright Medical artificial hip implanted in the left side of his body in a procedure known as a total hip arthroplasty (THA).

112.     On March 5, 2007 Plaintiff Benjamin F. Owens had a Wright Medical artificial hip implanted in the right side of his body in a procedure known as a total hip arthroplasty (THA).

113.     The surgeon who implanted Plaintiff's Wright Medical artificial hips was Theodore Firestone, M.D.

114.     Plaintiff's hip implant surgeries were performed at Scottsdale Shea Medical Center, 9003 East Shea Boulevard, Scottsdale, Arizona 85260.

115.    Prior to the implantation of Plaintiff's Wright Medical artificial hips, a representative of Wright Medical told Dr. Firestone that Wright Medical Profemur/Conserve hips should last a minimum of 20 years to 30 years.

116.    It is expected that a fell fixed hip stem, implanted in the intended patient population, that is properly implanted, will not fracture at the femoral neck from metal fatigue, at any time during the remaining life of the patient.

117.    At the time of the implantation of Plaintiff's Wright Medical artificial hips, Wright Medical was on notice of fractures of the modular necks that its marketing materials distributed to surgeons in the United States had stated:

> The modular neck used with the Profemur Hip has been employed by Wright Cremascoli for over 15 years.  The necks were designed in 1985 and have been successfully implanted in over 50,000 patients requiring both primary and revision hip procedures.  The necks are used in other Wright Cremascoli hip systems besides the Profemur Hip.  None of the necks has experienced a clinical failure since their inception.

[e.g., Wright Medical Technical Monograph MH688-102 © 2002, and © 2004.]

118.    At the time of the implantation of Plaintiff's October 16, 2006 Wright Medical artificial hip, Wright Medical was on notice of more than a dozen fractures of the modular necks and its marketing materials distributed to surgeons in the United States had stated:

> The modular neck system, designed by Cremascoli in 1985 (U.S. Patent # 4,957,510), has now been successfully implanted in over 50,000 patients requiring both primary and revision hip arthroplasty.  Extensive laboratory tests have proven that the coupling between the modular neck and femoral implant guarantees:
>
> - Structural reliability
> - Absence of significant micromovement
> - Absence of fretting corrosion

[e.g., Wright Medical Technical Monograph MH688-102 © 2002, and © 2004.]

22

119.    At the time of the implantation of Plaintiff's October 16, 2006 Wright Medical artificial hip, Wright Medical was on notice and aware of fractures of the titanium Profemur modular necks that it had been distributing in the United States.

120.    Between the time of the implantation of Plaintiff's October 16, 2006 Wright Medical artificial hip, and the implantation of his March 5, 2007 Wright Medical artificial hip, Wright Medical was on notice and aware of additional fractures of the titanium Profemur modular necks that it had been distributing in the United States.

121.    Prior to the implantation of Plaintiff's October 16, 2006 Wright Medical artificial hip, Wright Medical did not inform Plaintiff's surgeon that it had notice or knowledge of fractures of its titanium Profemur modular necks.

122.    Prior to the implantation of Plaintiff's March 5, 2007 Wright Medical artificial hip, Wright Medical did not inform Plaintiff's surgeon that it had notice or knowledge of fractures of its titanium Profemur modular necks.

123.    Prior to the implantation of Plaintiff's March 5, 2007 Wright Medical artificial hip, Wright Medical did not inform Plaintiff's surgeon that it had notice or knowledge of fractures of its titanium Profemur modular necks that had occurred since the implantation of Plaintiff's October 16, 2006 hip.

124.    Theodore P. Firestone, M.D., did not violate any generally accepted standards of care in the field of orthopedic surgery in his care and treatment of Plaintiff in any of the following respects:

    a.  In the care or treatment that he provided to Plaintiff Benjamin F. Owens prior to beginning either of Mr. Owens' hip implant surgeries;

    b.  In the information that he did or did not provide Plaintiff Benjamin F. Owens prior to beginning either of Mr. Owens' hip implant surgeries;

     c.   In the selection of the Wight Medical Profemur Hip Systems, or any of its components, that were implanted in Plaintiff Benjamin F. Owens;

     d.   In the hip implant surgeries he performed on Plaintiff Benjamin F. Owens;

     e.   In the care or treatment that he provided to Plaintiff Benjamin F. Owens, subsequent to Mr. Owens' hip implant surgeries; and,

     f.   In the information that he did or did not provide to Plaintiff Benjamin F. Owens subsequent to Mr. Owens' hip implant surgeries.

125.    Based upon the patient population that Wright Medical intended its artificial hip systems to be implanted in, at the time of implantation with his Wright Medical hips, Plaintiff Benjamin F. Owens was an appropriate patient to be implanted with the Wright Medical hip products he received.

126.    Plaintiff's surgeon, Theodore P. Firestone, M.D., recommended the Wright Medical hip systems to Plaintiff Benjamin F. Owens and indicated that the Wright Medical hip systems implants were appropriate implants for him.

127.    Plaintiff Benjamin F. Owens reasonably relied upon the statements of Theodore P. Firestone, M.D., in deciding to proceed with hip replacement surgery and have Wright Medical hip systems implanted in him.

128.    "Patient Testimonials" and "Patient Stories" published by Wright Medical on Wright Medical's internet website prior to October 2006, and March 2007, promoting Wright Medical's hips, demonstrate the patient population, and activity levels, that Wright Medical intended for its Profemur hips.

129.    "Patient Testimonials" and "Patient Stories" published by Wright Medical on Wright Medical's internet website subsequent to October 2006, and March 2007, promoting Wright Medical's hips, demonstrate the patient population, and activity levels, that Wright Medical intended for its Profemur hips.

130.    The paid endorsements of professional tennis player Jimmy Connors, published by Wright Medical on a website it created and maintained, www.Jimmysnewhip.com, and other digital and printed materials promoting Wright Medical hips by Jimmy Connors, demonstrate the patient population, and activity levels, that Wright Medical intended for its Profemur hips.

131.    In his total hip replacement surgery on October 16, 2006, Plaintiff Benjamin F. Owens had implanted in his left hip the following specific Wright Medical devices and components:

      a.  Wright Cremascoli Profemur® Z Plasma Stem
          Size 4
          Ref: PHA0-0266
          Lot: 086365299

      b.  Wright Cremascoli Profemur® Modular Neck
          Size AR/VV2 Long
          REF: PHA0-1214
          Lot: V05215417

      c.  Conserve® Total A-Class Head
          54mm O.D.; -3.5 Neck
          REF: 38AM-5404
          Lot: 085265551

      d.  Conserve® Plus HA Cup
          Size 60mm O.D.; 54mm I.D.
          Ref: 38HA-5460
          Lot: 076339868

132.    Based upon the patient population that Defendant Wright Medical intended its Profemur Hip Systems to be implanted in, and when Plaintiff Benjamin F. Owens had the devices implanted in him on October 16, 2006, he was an appropriate patient to be implanted with these Wright Medical Profemur and Conserve hip products.

133.    In his total hip replacement surgery on March 5, 2007, Plaintiff Benjamin F. Owens had implanted in his right hip the following specific Wright Medical devices and components

     a.   Wright Cremascoli Profemur® Z Plasma Stem
          Size 3
          Ref: PHA0-0264
          Lot: 116386584

     b.   Wright Cremascoli Profemur® Modular Neck
          Size A/R Var/Val Long 1
          REF: PHA0-1224
          Lot: 116388779

     c.   Conserve® Total A-Class Head
          52mm O.D.; -3.5 Neck
          REF: 38AM-5204
          Lot: 065245197

     d.   Conserve® Plus HA Cup
          Size 58mm O.D.; 52mm I.D.
          Ref: 38HA-5258
          Lot: 017388281

134.    Based upon the patient population that Defendant Wright Medical intended its Profemur Hip Systems to be implanted in, and when Plaintiff Benjamin F. Owens had the devices implanted in him on March 5, 2007, he was an appropriate patient to be implanted with these Wright Medical Profemur and Conserve hip products.

135.    Subsequent to the date of implantation of his Wright Medical artificial hips, Plaintiff Benjamin F. Owens used his Wright Medical artificial hips in a normal and expected manner.

136.    Subsequent to the date of implantation of his Wright Medical artificial hips, Plaintiff Benjamin F. Owens used his Wright Medical artificial hips in a manner consistent with many of the representations made in "Patient Testimonials" and "Patient Stories" that appeared in the Wright Medical web site.

137.    On June 28, 2019, the titanium Profemur modular neck component of Plaintiff Benjamin F. Owens' right-side Profemur hip catastrophically structurally failed, breaking into two pieces.

138.    At the time of this catastrophic failure, Plaintiff Benjamin F. Owens was performing a normal and expected activity of his daily living, lifting his leg to put on a pair of pants.

139.    The structural failure of the titanium Profemur modular neck component of Plaintiff's right-side artificial hip was the result of a fatigue failure of the titanium, caused over time by cyclic loading of the device, resulting in a complete fracture of the modular neck.

140.    On July 1, 2019, Plaintiff Benjamin F. Owens' failed Wright Medical Profemur Hip was surgically removed and replaced by Lucas A. Anderson, M.D., at University of Utah Medical Center, 50 North Medical Drive, Salt Lake City, Utah 84132, in a procedure generally called a "revision" surgery.

141.    In Plaintiff's July 1, 2019 revision surgery, what otherwise was a well-fixed Wright Cremascoli Profemur Plasma Z Stem was removed and replaced.

142.    With the exception of the fact that the titanium modular neck had fractured, Plaintiff's right-side Profemur hip, including the Profemur modular neck and Profemur Plasma Z Stem in that hip were in substantially the same condition in all relevant respects as when they left Wright Medical's control.

143.    With the exception of the fact that the titanium modular neck of Plaintiff's right-side artificial hip had fractured, Plaintiff's right-side Profemur hip was not otherwise in need of hip revision surgery.

144.     With the exception of the fact that the titanium modular neck of Plaintiff's artificial hip had fractured in his right hip, Plaintiff's right-side Profemur hip was reasonably expected to have lasted for the remainder of his life.

145.     Plaintiff's left hip, originally implanted on October 16, 2006, is constructed of substantially similar Wright Medical Profemur devices as had been in Plaintiff's right hip, prior to the fracture of the Profemur modular neck in Plaintiff's right hip.

146.     The Profemur modular neck implanted in Plaintiff's left hip is most probably in the process of fracturing, and will catastrophically fail by fracture in the foreseeable future.

## **ALLEGATIONS OF DEFECTIVE PRODUCTS**

147.     The titanium Profemur modular neck is designed in a way that after implantation in a patient it is subject to micromotion and fretting corrosion at a point of high loading and stress, thereby increasing the potential for structural failure due to fatigue failure and fracture of the oblong taper at the distal end of the modular neck at or near the neck-stem junction.

148.     The titanium Profemur modular neck is manufactured in a way that after implantation in a patient it is subject to micromotion and fretting corrosion at a point of high loading and stress, thereby increasing the potential for structural failure due to fatigue failure and fracture of the oblong taper at the distal end of the modular neck, at or near the neck-stem junction.

149.     The titanium Profemur modular neck is designed in a way that after implantation in a patient it is subject to structural failure due to fatigue failure and fracture of the oblong taper at the distal end of the modular neck at or near the neck-stem junction as a result of being subjected to the normal and expected activities of daily living.

150.    The Profemur Hip System in general, and the titanium Profemur modular neck implanted in Plaintiff Benjamin F. Owens, was not merchantable, and was unreasonably dangerous for its intended and/or reasonably foreseeable uses in that:

A. It was and is unreasonably dangerous under Colorado, Utah, and Tennessee product liability law as a result of one or more of a combination of the following:

(1) the Profemur Hip System was designed in such a way that the point of highest stress on the modular neck is at the neck-stem junction;

(2) the Profemur Hip System was designed in such a way that the modular neck was subject to micromotion and fretting corrosion at its point of highest stress, thereby increasing the potential for failure by fatigue fracture;

(3) the surface of the section of the neck that was inserted into the femoral stem was designed in such a manner as to increase the potential for fretting and corrosion and failure;

(4) the portion of the neck that was inserted in the femoral stem was in a narrow, confined space, thereby increasing the potential for fretting, corrosion and failure;

(5) the components were designed in such a way as to make the modular neck component more susceptible to fretting and corrosion than other existing alternative products, thereby increasing the potential for failure;

(6) the components were designed in such a way as to make the modular neck component more susceptible to fatigue failure and fractures than other existing alternative products;

(7) the risk of neck fracture outweighed the utility of the device, considering other technically feasible alternatives, and other already existing alternative products;

(8) a reasonably prudent manufacturer or seller, given knowledge of the product's condition, would not have marketed or sold the product; and,

(9) there may be other conditions or defects yet to be determined.

B. It was dangerous to an extent beyond which would be contemplated by the ordinary consumer with the ordinary knowledge common to the community as to its characteristics in that:

(1) the ordinary consumer would not contemplate that the ordinary activities of daily living would result in the catastrophic structural failure of the titanium modular neck;

(2) the ordinary consumer would not contemplate that the titanium modular neck would catastrophically structurally fail as a result of being used in the manner and for activity levels that Wright Medical intended; and,

(3) the ordinary consumer would not contemplate that the titanium modular neck would catastrophically structurally fail as a result of being used in the manner and for activity levels that Wright Medical posted on its website as "Patient Testimonials" and "Patient Stories".

151.    The titanium Profemur modular neck is not designed to withstand the normal activities of daily living after implantation without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component.

152.    The titanium Profemur modular neck is not designed to withstand the normal activities of daily living after implantation in "heavyweight" patients, as Wright Medical defined and used that term, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component.

153.    The titanium Profemur modular neck is not designed to withstand the activities of "high impact sports," as Wright Medical defined and used that term, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component.

154.    The titanium Profemur modular neck is not designed to withstand the activities of patients "involved in an occupation or activity which includes substantial walking, running, lifting, or muscle straining," as Wright Medical defined and used those terms, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component.

155.     The titanium Profemur modular neck was not designed to withstand the forces that were known would be encountered in the normal activities of daily living for all of the patient population that the product was intended for, without catastrophic structural failure of the titanium Modular neck from a fatigue fracture during the expected useful life of that component.

156.     The titanium Profemur modular neck was not designed to withstand the forces that were known would be encountered in the normal activities of daily living for all of the patient population that the product was marketed for, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component.

157.     The titanium Profemur modular neck was not designed to withstand the forces that were known would be encountered in the normal activities of daily living, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component, for some of the people who appeared on Wright Medical's web site "Patient Testimonials" and "Patient Stories" web pages.

158.     The titanium Profemur modular neck was not designed to withstand the forces, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component, and that were expected would be encountered in the activities of daily living of Jimmy Connors, a professional tennis player, who, after his hip replacement surgery, was compensated by Wright Medical to be a spokesperson on behalf of Wright Medical artificial hip products.

159.     The titanium Profemur modular neck was not designed to withstand the forces, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component, that were known would be encountered in the activities of daily living of Ramon Garcia, who, after his hip replacement surgery, provided a "Patient

Testimonial" on behalf of Wright Medical, that shows him jumping from the side of his pick-up truck.

160.    The titanium Profemur modular neck was not designed to withstand the forces, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component, that were known would be encountered in the activities of daily living of Roger Klein, who, eight weeks after hip replacement surgery returned to work "lifting and moving heavy objects," and who, after his hip replacement surgery, provided a "Patient Testimonial" on behalf of Wright Medical.

161.    The titanium Profemur modular neck was not designed to withstand the forces, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component, that were known would be encountered in the activities of daily living of Evelyn, a marathon runner and dirt bike rider, who, after her hip replacement surgery, provided a "Patient Story" on behalf of Wright Medical, and appeared on the cover of the Wright Medical Group, Inc., 2010 Annual Report, sitting on a dirt bike.

162.    The titanium Profemur modular neck was not designed to withstand the forces, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component, that were known would be encountered in the activities of daily living of Lawrence (a/k/a "Larry"), who weighed more than 230 lbs. at the time of his implant surgery, and who, after his hip replacement surgery, provided a "Patient Story" on behalf of Wright Medical.

163.    The titanium Profemur modular neck was not designed to withstand the forces, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component, that were known would be encountered in the activities

of daily living of Kevin, who weighed more than 230 lbs. at the time of his implant surgery, and who, after his hip replacement surgery, provided a "Patient Story" on behalf of Wright Medical.

164.    The titanium Profemur modular neck was not designed to withstand the forces, without catastrophic structural failure of the titanium modular neck from a fatigue fracture during the expected useful life of that component, that were known would be encountered in the activities of daily living of Plaintiff Benjamin F. Owens in this case.

165.    Wright Medical marketed and promoted its Conserve® and Profemur® artificial hips as appropriate for persons who wanted to return to an active lifestyle, which was a material consideration by Plaintiff Benjamin F. Owens in choosing to have artificial hip surgery.

166.    The titanium Profemur modular neck was not tested in design and development at the level of forces that would be equivalent to the forces it would be subjected to in the activities of living in the patient population that Wright Medical marketed these devices for use in.

167.    The titanium Profemur modular neck was not tested in design and development at the level of forces that would be equivalent to the forces it would be subjected to in the normal activities of daily living of "heavyweight" patients, as Wright Medical defined and used that term.

168.    The titanium Profemur modular neck was not tested in design and development at the level of forces that would be equivalent to the forces it would be subjected to in the reasonably expected activities of patients who engaged in "high impact sports," as Wright defined and used that term.

169.    The titanium Profemur modular neck was not tested in design and at the level of forces that would be equivalent to the forces it would be subjected to in the reasonably expected activities of patients "involved in an occupation or activity which includes substantial walking, running, lifting, or muscle straining," as Wright defined and used those terms.

170.    The titanium Profemur modular neck was not tested for the FDA Section 510(k) Premarket Notification Process at the level of forces that were known would be encountered in the activities of daily living of the patient population that Wright Medical intended to market these devices for use in.

171.    The titanium Profemur modular neck was not tested for the FDA Section 510(k) Premarket Notification Process at the level of forces that were known would be encountered in the normal activities of daily living of active patients, as Wright Medical defined and used that term.

172.    The titanium Profemur modular neck was not tested for the FDA Section 510(k) Premarket Notification Process at the level of forces that were known would be encountered in the activities of patients who engaged in "high impact sports," as Wright defined and used that term.

173.    The titanium Profemur modular neck was not tested for the FDA Section 510(k) Premarket Notification Process at the level of forces that were known would be encountered in the activities of patients "involved in an occupation or activity which includes substantial walking, running, lifting, or muscle straining," as Wright defined and used those terms.

174.    The titanium Profemur modular neck was not tested for the FDA section 510(k) Premarket Notification Process at the forces equal to the level of activities of patients that Wright Medical subsequently marketed these devices for use in.

## **ALLEGATIONS OF WRIGHT MEDICAL'S CONDUCT**

175.    Defendant Wright Medical made the following representations in brochures it produced to provide information about its Profemur hip products:

> The modular neck used with the Profemur Hip has been employed by Wright Cremascoli for over 15 years.  The necks were designed in 1985 and have been successfully implanted in over 50,000 patients requiring both primary and revision hip procedures.  The necks are used in other Wright Cremascoli hip systems besides the Profemur Hip.  None of the necks has experienced a clinical failure since their inception.

[e.g., Wright Medical Technical Monograph MH688-102 © 2002, and © 2004.]

176.   The products, documents, and records that existed at and within Cremascoli Ortho Group were acquired by Wright Medical, when it acquired Cremascoli Ortho on December 22, 1999.

177.   Before the date of December 22, 1999, the titanium modular neck that had been "employed by Wright Cremascoli for over 15 years," and had been "designed in 1985," was known by Cremascoli Ortho to have sustained structural failures by fractures of the modular neck.

178.   Before the date of December 22, 1999, Cremascoli Ortho knew of fractures of its titanium modular necks which had occurred since 1985.

179.   By the date of the first 510(K) application for a Profemur product by Wright Medical, there were fractures of titanium Profemur modular necks known to Wright Medical to have occurred since 1985.

180.   Between the year 1985 and December 13, 2000 (the date Wright Medical received clearance from the FDA to distribute these devices in the United States), there had been fractures of titanium Profemur modular necks known to Cremascoli Ortho.

181.   Surgeons, as the "learned intermediary" who selected and implanted these devices, had a right to know that fractures of Wright Medical titanium Profemur modular necks had occurred, so that they could consider that information in deciding whether or not to choose these devices for implantation in a particular patient.

182.   Prior to May 5, 2007, a least one dozen fractures of titanium Profemur modular necks "employed by Wright Cremascoli for over 15 years," and that had been "designed in 1985," had occurred.

183.    Prior to May 5, 2007, Wright Medical did not inform Plaintiff's surgeon, Dr. Firestone that any fractures of its titanium Profemur modular necks had occurred.

184.    Prior to the implant of the titanium Profemur modular neck in Plaintiff Benjamin F. Owens on May 5, 2007, Wright Medical did not warn patients, surgeons, hospitals, customers, or its field representatives that the neck component of its modular neck devices for use in hip surgery were known to be failing from structural failure by fracture of the modular neck.

185.    Prior to January 2005 and December 2008 Wright Medical did not inform surgeons, as the "learned intermediary" who selected and implanted these devices, that fractures of Wright Medical titanium Profemur modular necks had occurred.

186.    The titanium Profemur modular neck was known by Wright Medical to be failing at "higher than normal rates of early failure," as Wright Medical defined and used that term, from structural failure by fracture of the modular neck, prior to the time it fractured in Plaintiff Benjamin F. Owens.

187.    Prior to the date of the catastrophic failure of Plaintiff's Profemur modular neck, Wright Medical did not warn patients that the titanium Profemur modular neck was known to be suddenly and catastrophically failing from structural failure by fracture of the modular neck during normal activities of daily living.

188.    Prior to the date of the catastrophic failure of Plaintiff's Profemur modular neck, Wright Medical did not warn patients that the titanium Profemur modular neck was known to be suddenly and catastrophically structurally failing by fracture of the modular neck in high activity patients.

189.     The titanium Profemur modular neck is of a design that it may suddenly and catastrophically fail when being used in accordance with the levels of activity and use by the patient population that it was marketed for by Wright Medical.

190.     The titanium Profemur modular neck is of a design that it may structurally fail by suddenly breaking into two pieces, often without any prior symptoms, notice or warning of impending failure.

191.     The titanium Profemur modular neck is of a design that it will structurally fail by suddenly breaking into two pieces, often without any prior symptoms, notice or warning of impending failure, when being used in reasonable and foreseeable ways.

192.     The Wright Medical hip system with the titanium Profemur modular neck was marketed by Wright Medical and the sales and marketing representatives Wright Medical trained, for uses and durability that exceeded its design and its structural limitations known to Wright Medical.

193.     The Wright Medical hip system with the titanium Profemur modular neck was marketed by Wright Medical and its trained representatives for uses and durability that exceeded their design, capabilities, and limitations as stated in the IFUs that Wright Medical published for these devices.

194.     Prior to the dates of implants in Plaintiff Benjamin F. Owens, the Wright Medical hip system with the titanium Profemur modular neck was known by Wright Medical to be failing from structural failure of the necks at a rate higher than the structural failure rate of the neck on stems of other comparable artificial hip systems readily available on the market that did not employ a modular neck design.

195.    Prior to the dates of implants in Plaintiff Benjamin F. Owens, the Wright Medical hip system with the titanium Profemur modular neck was known by Wright Medical to be failing from structural failure of the modular necks at a rate higher than the structural failure rate of other comparable modular stem artificial hip systems readily available on the market that did not have a modular junction at the point where the neck joins the femoral stem.

196.    Prior to the dates of implants in Plaintiff Benjamin F. Owens Wright Medical did not warn patients, surgeons, hospitals, customers, distributors, or the sales representatives it trained, that the femoral necks of its Profemur Hip System were fracturing at a rate higher than other comparable artificial hip systems readily on the market that did not employ a titanium modular neck design at the point of the femoral neck-stem junction.

197.    Prior to the dates of implants in Plaintiff Benjamin F. Owens Wright Medical did not warn patients, surgeons, hospitals, customers, distributors, or the sales representatives it trained, that higher patient weight, and higher levels of patient activity, placed a patient at a higher risk of the titanium Profemur modular neck structurally failing by fracture.

198.    The Wright Medical hip system with the titanium Profemur modular neck is designed, manufactured, labeled, marketed, and promoted in such a way that it fails by the modular neck structurally failing by fracture and needs to be surgically revised in substantially less time than other comparable devices readily available on the market.

199.    The Wright Medical hip system with the titanium Profemur modular neck is designed, manufactured, labeled, marketed, and promoted in such a way that it has a substantially higher rate of structure failure by modular neck fracture than other comparable devices readily available on the market.

200.    After Wright Medical received notice that the titanium Profemur modular necks were failing from structural failure of the neck by fractures at "higher than normal rates of early failure," and at rates higher than other comparable hip systems, it did not timely disclose that information to patients, surgeons, or hospitals.

201.    After Wright Medical received notice that the Wright Medical hip system with the titanium Profemur modular neck was failing from the structural failure by fractures at "higher than normal rates of early failure," and at rates higher than other comparable hip systems, Wright Medical continued to market, distribute, and sell these devices to hospitals, surgeons, patients and other customers and consumers.

202.    After Wright Medical received notice that the Wright Medical hip system with the titanium Profemur modular neck was failing from structural failure of the modular neck by fractures at "higher than normal rates of early failure," and at rates higher than other comparable hip systems, it did not provide post-sale warnings to patients who had these devices implanted that included the following information:

  a.  The modular neck of their hip may suddenly and catastrophically structurally fail, without any warning, by breaking in two, when being used in normal activities of daily living;

  b.  If the modular neck of their hip did suddenly and catastrophically fail, it may cause them to fall, they would most likely not be able to get up, stand on that leg, or walk, and depending on where they were, and what they were doing, at the time of the failure, they could suffer serious injury or death;

  c.  These devices were structurally failing by fractures of the modular necks at "higher than normal rates of early failure" in patients of many different weights and levels of activity;

  d.  These devices were structurally failing by fractures of the modular necks at "higher than normal rates of early failure" in active patients;

  e.  These devices were structurally failing by fractures of the modular necks at "higher than normal rates of early failure" in heavyweight patients;

    f.   These devices were structurally failing by fractures of the modular necks at "higher than normal rates of early failure" when being used by patients for work, recreation, and lifestyles that Wright Medical had marketed and advertised these devices as being appropriate for;

    g.   In August of 2010 Wright Medical had modified the instructions for use that accompanied these products stating that for "heavyweight (>230 lbs.) . . . . alternative devices, such as Cobalt Chrome modular necks and monoblock hip stems, may also be considered for these patients;" and,

    h.   Wright stopped distribution of all of its titanium modular necks in the United States because of the unacceptably high structural failure rate.

203.    After Wright Medical received notice that the Wright Medical hip system with the titanium Profemur modular neck was failing from structural failure of the modular neck by fractures at "higher than normal rates of early failure," and at rates higher than other comparable hip systems, it did not request surgeons who implanted these devices to provide, at Wright Medical's expense, post-sale warnings to patients who had these devices implanted that included the following information:

    a.   The modular neck of their hip may suddenly and catastrophically structurally fail, without any warning, by breaking in two, when being used in normal activities of daily living;

    b.   If the modular neck of their hip did suddenly and catastrophically structurally fail, it may cause them to fall, they would most likely not be able to get up, stand on that leg, or walk, and depending on where they were, and what they were doing, at the time of the failure, they could suffer serious injury or death;

    c.   These devices were structurally failing by fractures of the modular necks at "higher than normal rates of early failure" in patients of many different weights and levels of activity;

    d.   These devices were structurally failing by fractures of the modular necks at "higher than normal rates of early failure" in active patients;

    e.   These devices were structurally failing by fractures of the modular necks at "higher than normal rates of early failure" in heavyweight patients;

    f.   These devices were structurally failing by fractures of the modular necks at "higher than normal rates of early failure" when being used by patients for

work, recreation, and lifestyles that Wright Medical had marketed and advertised these devices as being appropriate for;

g.  In August of 2010 Wright Medical had modified the instructions for use that accompanied these products stating that for "heavyweight (>230 lbs.) . . . . alternative devices, such as cobalt chrome modular necks and monoblock hip stems, may also be considered for these patients;" and,

h.  Wright stopped distribution of all titanium modular necks in the United States because of the higher than expected structural failure rate of that component.

## ACCRUAL OF THIS CAUSE OF ACTION

204.    Prior to June 28, 2019, Plaintiff Benjamin F. Owens had neither knowledge nor notice that there was any defect in the design, manufacture or labeling of his implanted titanium Profemur modular neck.

205.    Prior to June 28, 2019, Plaintiff Benjamin F. Owens had neither knowledge nor notice that he had suffered any injury because of any actions or inactions, errors or omissions, by Wright Medical.

206.    It was not until June 28, 2019, Plaintiff Benjamin F. Owens first had any notice or knowledge that his injuries and/or that the failure of the titanium Profemur modular neck implanted on his right-side was the result of any defects in the design, manufacture, warning or labeling of his implanted Profemur modular neck or Profemur Hip System.

207.    Prior to June 28, 2019, Plaintiff Benjamin F. Owens did not know, and could not have known by the exercise of reasonable diligence, that his hip had been injured by the failure of the titanium Profemur modular neck.

208.    Prior to June 28, 2019, Plaintiff Benjamin F. Owens did not know and could not have known by the exercise of reasonable diligence, the cause of injury and symptoms to his right hip.

209.    Prior to June 28, 2019, Plaintiff Benjamin F. Owens had no reason to know or suspect that the implanted Wright Medical Profemur Hip was defective or was in the process of structurally failing due to a fatigue fracture.

210.    Plaintiff Benjamin F. Owens' cause of action, as alleged in this Complaint against Defendants, did not accrue until June 28, 2019.

## PLAINTIFFS' INJURIES AND DAMAGES

211.    As a direct and proximate result of the failure of Plaintiff's Profemur Hip System, Plaintiff Benjamin F. Owens has sustained injuries and damages including, but not limited to:

(a) undergoing surgery to remove and replace the failed prosthesis system;

(b) past and future pain and anguish, both in mind and in body;

(c) permanent diminishment of his ability to participate in and enjoy the affairs of life;

(d) medical bills associated with the replacement procedure and recovery therefrom;

(e) future medical expenses;

(f) loss of enjoyment of life;

(g) disfigurement; and,

(h) physical impairment.

212.    As a direct and proximate result of the failure of Plaintiff's Profemur Hip System, Plaintiff Cynthia A. Owens has sustained injuries and damages including, but not limited to the loss of consortium of her husband, Benjamin F. Owens.

## CAUSES OF ACTION

## COUNT I

## STRICT LIABILITY OF WRIGHT MEDICAL

213.    Plaintiffs incorporate by reference the facts and allegations set forth in the paragraphs above of this Complaint.

214.    Defendant Wright Medical had a duty to place into the stream of commerce, manufacture, import, distribute, market, promote and sell the Profemur Hip System in general, and specifically the titanium Profemur modular neck (the "device"), so that it was neither defective nor unreasonably dangerous when put to the use for which it was designed, manufactured, distributed, marketed and sold.

215.    On and prior to August 12, 2008, Defendant Wright Medical was engaged in the business of designing, manufacturing, importing, marketing, distributing and selling orthopedic hip implants and did design, manufacture, import distribute, market and sell the Wright Medical Profemur Hip System, and the Wright Medical titanium Profemur modular neck.

216.    Defendant Wright Medical did in fact manufacture, sell, distribute, supply and/or promote the Wright Medical Profemur Hip System, and the Wright Medical titanium Profemur modular neck to Plaintiff Benjamin F. Owens, Sky Ridge Medical Center, and/or Plaintiff's surgeon.

217.    Defendant Wright Medical expected the Wright Medical Profemur Hip System, and the Wright Medical titanium Profemur modular neck, it was importing, selling, distributing, supplying, manufacturing and/or promoting, to reach, and which did in fact reach, hospitals, implanting physicians, and consumers in the State of Colorado, including Plaintiff Benjamin F.

Owens, Sky Ridge Medical Center, and/or Plaintiff's surgeon, without substantial change in its condition.

218.    At the time the Wright Medical Profemur Hip System, and the Wright Medical titanium Profemur modular neck, left the possession of Defendant Wright Medical, and at the time the device entered the stream of commerce, it was in an unreasonably dangerous or defective condition.  These defects include, but are not limited to, the following:

(a) the device was not reasonably safe as intended to be used;

(b) the Profemur Plasma Z Stem did not have clearance from the United States Food and Drug Administration to be distributed in the United States to be implanted in patients in combination with titanium Profemur modular necks;

(c) the device had an inadequate design for the purpose of hip replacement in the population it was intended to be used in and was marketed to;

(d) the device contained unreasonably dangerous design defects, including an inherently unstable and defective design, i.e., use of titanium alloys in the modular neck, which resulted in an unreasonably high probability of structural failure;

(e) the device's defective design resulted in a hip prosthesis that had risks which exceeded the utility of the medical device;

(f) the device was dangerous to an extent beyond which would be contemplated by the ordinary consumer;

(g) a reasonably prudent manufacturer, distributor, or seller, given knowledge of the device's condition, would not have marketed, distributed or sold the device;

(h) the device was not appropriately or adequately tested before its distribution or sale; and,

(i) the device has an unreasonably high propensity for corrosion, fretting and fatigue failure under normal, intended, and expected use.

219.    At the time of Defendant Wright Medical's design, manufacture, importation, marketing, distribution, and sale of the Wright Medical Profemur Hip System, and the Wright Medical titanium Profemur modular neck, feasible, alternative safer designs for the device were

known and available to Wright Medical, including, but not limited to, designs that utilized manufacturing and finishing processes that would make the titanium modular neck stronger in this application, less susceptible to fretting and corrosion, and less likely to suffer a structural failure from fatigue than the design and processes that were in fact used by Wright Medical.

220.    At the time of Defendant Wright Medical's design, manufacture, importation, marketing, distribution, and sale of the Wright Medical Profemur Hip System, and the Wright Medical titanium Profemur modular neck, feasible, alternative safer designs for the device were known and available to Wright Medical, including, but not limited to, designs that utilized a cobalt-chromium alloy rather than a titanium alloy for the modular neck that would make the modular neck stronger in this application, less susceptible to fretting and corrosion, and less likely to suffer a structural failure from fatigue.

221.    Had Defendant Wright Medical properly and adequately tested the device, it would have discovered that over time the titanium modular neck it designed would not withstand the stress it was expected to be subjected to in the ordinary and expected use of the device in a significant number of patients that it was intended to be used in, and marketed to be used in, and was certain to structurally fail in numbers and at rates significantly higher than expected, and was certain to structurally fail in numbers and at rates significantly higher than other available alternative devices.

222.    Defendant Wright Medical's titanium Profemur modular necks were, therefore, defective in design in that, when they left the hands of Defendant Wright Medical, the foreseeable risk of harm from the product exceeded or outweighed the benefit or utility of the device's design, and/or it was dangerous to an extent beyond which would be contemplated by the ordinary user or consumer.

223.    The foreseeable risks associated with the design of the titanium Profemur modular neck devices include, but are not limited to, the fact that the design of the devices is more dangerous than a reasonably prudent consumer would expect when used in an intended or reasonably foreseeable manner.

224.    As a direct and proximate result of the conduct of Defendant Wright Medical as set forth herein, Plaintiff Benjamin F. Owens has suffered injuries and damages.

## COUNT II

## NEGLIGENT MISREPRESENTATION

225.    Plaintiffs incorporate by reference the facts and allegations set forth in the paragraphs above of this Complaint.

226.    The Profemur Plasma Z Stem did not have clearance from the United States Food and Drug Administration to be distributed in the United states for implantation in combination with titanium Profemur modular necks.

227.    In the exercise of reasonable care, Defendant Wright Medical should have known that its Profemur Hip System devices in general, and the titanium Profemur modular neck specifically, failed to comply with federal requirements for safe design, manufacture, warning, and labeling, yet it negligently misrepresented to Plaintiff Benjamin F. Owens, and/or his surgeon, that its Profemur Hip System in general, and the titanium Profemur modular neck specifically, was safe and met all applicable design, manufacturing, and warning requirements.

228.    Defendant Wright Medical made false representations and material omissions in its marketing, advertisements, promotions and labeling concerning these products for use in patients such as Plaintiff Benjamin F. Owens, and Defendant had a pecuniary interest in making these representations and omissions.

229.    Defendant Wright Medical, furthermore, in advertising, marketing, promoting, packaging, importing, distributing and selling the titanium Profemur modular neck negligently misrepresented material facts regarding their safety, history of without clinical failures, efficacy, guarantees of structural reliability, and guarantees of the absence of fretting corrosion.

230.    Defendant Wright Medical, in advertising, marketing, promoting, packaging, labeling, importing, distributing, and selling the Profemur hip, negligently misrepresented material facts regarding their safety, history of without clinical failures, efficacy, guarantees of structural reliability, and guarantees of the absence of fretting corrosion, by claiming the Profemur hip using the titanium Profemur modular neck had been adequately and reliably tested when, in fact, it had not.

231.    Defendant Wright Medical, in advertising, marketing, promoting, packaging, labeling, importing, distributing, and selling the Profemur hip, negligently misrepresented material facts regarding their safety, history of without clinical failures, efficacy, guarantees of structural reliability, and guarantees of the absence of fretting corrosion, by claiming the risk of serious adverse events and/or effects from the Profemur hip using the titanium Profemur modular neck was comparable to that of other hip replacement systems when, in fact, it was not.

232.    Defendant Wright Medical, in advertising, marketing, promoting, packaging, labeling, importing, distributing, and selling the Profemur hip, negligently misrepresented material facts regarding its safety, efficacy and fitness for human use by claiming the Profemur hip using the titanium Profemur modular neck had not caused or contributed to serious adverse events and/or effects requiring the premature explants of the device when, in fact, it had.

233.    Defendant Wright Medical, as manufacturers, importers, distributors, and sellers of medical devices for implantation, owed a duty of care to see that it communicated truthful

47

information to Plaintiff Benjamin F. Owens and his surgeon, but negligently breached that duty by failing to exercise due care in its representations and omissions regarding the Profemur Hip System devices in general, and the titanium Profemur modular neck specifically.

234.    Plaintiff Benjamin F. Owens and/or his surgeon justifiably relied upon Defendant's misrepresentation and omissions in its marketing, advertisements, promotions and labeling concerning these products, including Defendant's representations that the Profemur Hip System devices in general, and the titanium Profemur modular neck specifically, were safe for use in persons such as Plaintiff Benjamin F. Owens.

235.    Plaintiff Benjamin F. Owens and/or his surgeon justifiably relied upon Defendant's misrepresentation and omissions in its marketing, advertisements, promotions and labeling concerning these products, including Defendant's representations that the Profemur Plasma Z Hip Stem devices in general, were legally marketed in compliance with FDA regulations for implantation in persons such as Plaintiff Benjamin F. Owens, when in fact they were not.

236.    As a direct and proximate result of Defendant Wright Medical's negligent misrepresentations and omissions related to the Profemur Hip System devices in general, and the titanium Profemur modular neck specifically, Plaintiff Benjamin F. Owens made the conscious and affirmative decision to proceed with hip replacement surgery with the Wright Medical Profemur hip.

237.    As a direct and proximate result of Defendant Wright Medical's negligent misrepresentations and omissions related to the Profemur Hip System devices in general, and the titanium Profemur modular neck specifically, Plaintiff's surgeon Theodore P. Firestone, M.D., used the Profemur Hip System devices in general, and the titanium Profemur modular necks specifically, in Plaintiff Benjamin F. Owens.

48

238.    Defendant Wright Medical, in advertising, marketing, promoting, packaging, labeling, importing, distributing, and selling the Profemur hip, negligently misrepresented material facts regarding its safety, efficacy and fitness for human use by claiming the Profemur hip using the titanium Profemur modular neck had never experienced a clinical failure, when in fact it had experienced clinical failures by fracture of the modular neck.

239.    Defendant Wright Medical, as manufacturers, importers, distributors, and sellers of medical devices for implantation, owed a duty of care to see that it communicated truthful information to Plaintiff Benjamin F. Owens, and his surgeon as the learned intermediary, but negligently breached that duty by failing to exercise due care in its representations and omissions regarding the Profemur Hip System devices in general, and the titanium Profemur modular neck specifically.

240.    Plaintiff Benjamin F. Owens, and/or his surgeon as the learned intermediary, justifiably relied upon Defendant's misrepresentation and omissions in its marketing, advertisements, promotions and labeling concerning these products, including Defendant's representations that the Profemur Hip System devices in general, and the titanium Profemur modular neck specifically, were safe for use in persons such as Plaintiff Benjamin F. Owens.

241.    As a direct and proximate result of Defendant Wright Medical's negligent misrepresentations and omissions related to the Profemur Hip System devices in general, and the titanium Profemur modular neck specifically, Plaintiff Benjamin F. Owens made the conscious and affirmative decision to proceed with hip replacement surgery with the Wright Medical Profemur hip.

242.    As a direct and proximate result of Defendant Wright Medical's negligent misrepresentations and omissions related to the Profemur Hip System devices in general, and the

titanium Profemur modular neck specifically, Plaintiff's surgeon Theodore P. Firestone, M.D., used the Profemur Hip System devices in general, and the titanium Profemur modular neck specifically, in Plaintiff Benjamin F. Owens.

243.    As a direct and proximate result of Defendant Wright Medical's negligence, failure to exercise ordinary care, and other tortious and wrongful conduct as set forth herein, Plaintiff Benjamin F. Owens and Plaintiff Cynthia A. Owens have suffered injuries and damages as set forth below.

244.    The representations made by Defendant Wright Medical regarding the Profemur Hip System devices in general, and the titanium Profemur modular neck specifically, were false, misleading, and negligent misrepresentations as to the appropriateness of these devices for use of this product in Plaintiff Benjamin F. Owens.

245.    As a direct and proximate result of the conduct of Defendant Wright Medical as set forth herein, Plaintiff Benjamin F. Owens has suffered injuries and damages.

## COUNT III

## NEGLIGENT FAILURE TO WARN

246.    Plaintiffs incorporate by reference the facts and allegations set forth in the paragraphs above of this Complaint.

247.    At all times relevant herein, Defendant Wright Medical was engaged in the design, development, testing, manufacturing, importing, marketing and sale of the Profemur Hip System devices in general, and the titanium Profemur modular neck specifically.

248.    Defendant Wright Medical designed, manufactured, imported, marketed, distributed, and sold the Profemur Hip System devices in general, and the titanium Profemur modular neck specifically, to hospitals, to surgeons, and to potential patients knowing that they

would then be implanted in patients in need of hip prosthesis with a wide variety of ages, height, body weight, activity levels, and lifestyles.

249.    Defendant Wright Medical distributed and sold the Profemur Hip System devices in general, and the titanium Profemur modular neck specifically, in a condition when they left their place of manufacture, in their original form of manufacture, which included the defects described herein.

250.    The Profemur Hip System devices in general, and the titanium Profemur modular neck specifically, were expected to and did reach Plaintiff Benjamin F. Owens and his implanting surgeon, Theodore P. Firestone, M.D., without substantial change in their condition as manufactured and sold by Defendant Wright Medical.

251.    Defendant Wright Medical's Profemur Hip System devices in general, and the titanium Profemur modular neck specifically, were designed, developed, tested, manufactured, marketed and sold or otherwise placed into the stream of commerce by Defendant Wright Medical in a dangerous and defective condition and posed a threat to most any and all users or consumers of these devices.

252.    At all times relevant herein, Plaintiff Benjamin F. Owens was a person who Defendant Wright Medical should have considered to be subject to the harm caused by the defective nature of the Profemur Hip System devices in general, and the titanium Profemur modular neck specifically.

253.    Defendant Wright Medical's Profemur Hip System devices, including the titanium Profemur modular neck, were implanted and used in the manner for which they were intended.

254.    Defendant Wright Medical knew or should have known through testing, adverse event reporting or otherwise, that its Profemur Hip System devices in general, and the titanium

Profemur modular neck specifically, created a substantially higher risk of bodily injury and serious harm, from structural failure of the titanium modular neck component by fatigue failure, than other available hip stem devices.

255.    Defendant Wright Medical had a duty to warn its sales representatives/distributors, purchasing hospitals, implanting surgeons such as Theodore P. Firestone, M.D., and patients, including Plaintiff Benjamin F. Owens, of this substantially higher risk of bodily injury and serious harm, from structural failure of the titanium modular neck component by fatigue failure.

256.    Defendant Wright Medical breached its duty in that it failed to provide adequate and timely warnings or instructions regarding its Profemur Hip System devices in general, and the titanium Profemur modular neck specifically, and their known defects.

257.    Defendant Wright Medical furthermore, breached its duty to warn at pre-surgery and/or post-surgery [i.e., post-sale] by (a) failing to adequately communicate the warning to its sales representatives/distributors, purchasing hospitals, surgeons, and/or to the ultimate users, patients such as Plaintiff Benjamin F. Owens; and/or (b) by failing to provide adequate warning of the risk of sudden catastrophic structural failure of the titanium Profemur modular neck.

258.    Adequate efforts to communicate a warning to the ultimate users were not made by Defendant Wright Medical and, to the extent a warning was communicated by this Defendant, the warning was inadequate, all of which was negligent conduct on the part of Defendant Wright Medical.

259.    The warnings, pre-surgery and/or post-surgery [i.e., post-sale], to Plaintiff Benjamin F. Owens and his implanting surgeon about the dangers the Profemur Hip System devices in general, and the titanium Profemur modular neck specifically, posed to consumers were

inadequate.  Examples of Defendant Wright Medical's negligence in the lack and/or inadequacy of its warnings include, but are not limited to, one or more of the following particulars:

(a) the packaging for the device did not disclose that the Profemur Plasma Z Stem did not have clearance from the United States Food and Drug Administration to be distributed in the United States;

(b) the device contained warnings insufficient to alert Plaintiff Benjamin F. Owens and Plaintiff's surgeon as to the reduced fatigue strength of the stem and neck, as well as to the risk of adverse events, i.e., neck fractures, associated with the titanium Profemur modular neck, subjecting Plaintiff Benjamin F. Owens to risks which exceeded the benefits of the device;

(c) the device contained misleading warnings emphasizing the efficacy of the device while downplaying the risks associated with it, thereby making use of the device more dangerous than the ordinary consumer would expect;

(d) the device contained insufficient and/or incorrect warnings to alert consumers, including Plaintiff Benjamin F. Owens, through their prescribing physicians regarding the risk, scope, propensity, frequency, duration and severity of the catastrophic structural failures associated with the titanium Profemur modular neck;

(e) the device did not disclose that it was inadequately tested;

(f) the device failed to convey adequate post-marketing warnings regarding the risk, severity, propensity, frequency, scope and/or duration of the dangers posed by the device;

(g) the device failed to contain instructions sufficient to alert consumers to the dangers it posed and to give them the information necessary to avoid or mitigate those dangers;

(h) the device's warning against use in "obese" and/or active patients was insufficient and inadequate;

(i) the device's warnings, such as they were, regarding the use of these devices in patients engaged in active lifestyles, high impact activities, were insufficient and inadequate;

(j) the device's warnings, such as they were, regarding the use of these devices in heavier patients, were insufficient and inadequate; and,

       (k) the device failed to communicate or failed to adequately communicate the events and conditions known to Wright Medical, set forth elsewhere above, and incorporated herein by reference.

260.    Plaintiff Benjamin F. Owens used the Wright Medical Profemur Hip System in general, and the Wright Medical titanium Profemur modular neck:

    a.  for its intended purpose;

    b.  for purposes demonstrated and represented by Wright Medical in its printed marketing and informational materials;

    c.  for purposes demonstrated and represented by Wright Medical in its "Patient Stories" and "Patient Testimonials" that appeared in its web site;

    d.  for purposes demonstrated and represented by Wright Medical in webinars intended for surgeons that Wright sponsored and that appeared in its web site;

    e.  for the lifestyle and purposes demonstrated and represented by Wright Medical and Jimmy Connors in the www.Jimmysnewhip.com website created by Wright Medical;

    f.  for the lifestyle and purposes demonstrated and represented by Wright Medical and in a "webinar" intended for viewing by orthopedic surgeons created by Wright Medical that featured Lowry Barnes, M.D., and Brad Penenberg, M.D.; and,

    g.  to return to the "active lifestyle" that Wright represented on its web site.

261.    Plaintiff Benjamin F. Owens could not have discovered any defect in the device through the exercise of reasonable diligence or due care.

262.    Defendant Wright Medical, as the designer, manufacturer, importer, marketer and distributor of medical devices is held to the level of knowledge of an expert in its field.

263.    Plaintiff Benjamin F. Owens and his implanting surgeon did not have substantially the same knowledge about the device as Defendant Wright Medical who was the designer, manufacturer, importer, and/or distributor of the device.

264.    Defendant Wright Medical should have known if its device was unsuited for active individuals such as Plaintiff Benjamin F. Owens, and expressly so stated in its instructional, marketing, and informational materials it published in paper, on the internet, in its IFU's and in the information it provided to its sales force and distributors.

265.    Theodore P. Firestone, M.D., a surgeon who implanted these devices, as the "learned intermediary" for the patient, here Plaintiff Benjamin F. Owens, had a right to know:

    a.  that the Profemur Plasma Z Stem did not have clearance from the United States Food and Drug Administration to be distributed in the United States;

    b.  that the claim made in Wright Medical printed materials that had been distributed claiming that, "None of the necks has experienced a clinical failure since their inception" was false;

    c.  that Wright Medical had received notice of clinical failures of titanium Profemur modular necks in the form of the structural failure of the modular neck by it suddenly and without warning catastrophically fracturing, before this device was chosen by the surgeon for implantation in Plaintiff Benjamin F. Owens;

    d.  that Wright Medical had received notice of clinical failures of titanium Profemur modular necks in the form of the structural failure of the modular neck suddenly and without warning catastrophically failing due to a fatigue failure of the oblong taper in the pocket of the Profemur stem;

    e.  that the "guarantee" of structural reliability was in fact not a guarantee, and that these devices were known to be catastrophically structurally failing from fatigue failures after implantation;

    f.  that the "guarantee" against significant micromotion was in fact not a guarantee and that significant micromotion was known to have occurred and was continuing to occur with these devices after implantation;

    g.  that the "guarantee" against fretting corrosion was in fact not a guarantee and that fretting corrosion was known to have occurred and was continuing to occur with these devices after implantation;

    h.  that Plaintiff Benjamin F. Owens was not an appropriate candidate for implantation of a Wright Medical Profemur modular hip because of his activity level; and,

      i.   that Plaintiff Benjamin F. Owens was not an appropriate candidate for implantation of a Wright Medical Profemur modular hip because of his lifestyle.

266.    Theodore P. Firestone, M.D., a surgeon who implanted these devices, as the "learned intermediary" for the patient, here Plaintiff Benjamin F. Owens, had a right to know that, contrary to the claims made in writing by Wright Medical that, "None of the necks has experienced a clinical failure since their inception," fractures of Wright Medical titanium Profemur modular necks had in fact occurred, so that he could consider that information in deciding whether or not to choose this device for implantation in Plaintiff, Benjamin F. Owens.

267.    The conduct of Defendant, as set forth above, rendered the Wright Medical titanium Profemur modular neck unreasonably dangerous.

268.    As a direct and proximate result of Defendant Wright Medical's failure to adequately warn, failure to warn, and other wrongful conduct as set forth herein, Plaintiff Benjamin F. Owens has suffered injuries and damages.

## COUNT IV

## GENERAL NEGLIGENCE OF WRIGHT MEDICAL

269.    Plaintiffs incorporate by reference the facts and allegations set forth in the paragraphs above of this Complaint.

270.    Defendant Wright Medical had a duty to exercise reasonable care in the design, manufacture, testing, quality assurance, quality control, labeling, warning, marketing, promotion, importation, sale and distribution, and in providing post-sale warnings, of the Profemur Total Hip System in general, and the titanium Profemur modular neck in particular.

271.    Defendant Wright Medical had a duty to exercise reasonable care to see that it complied with all applicable regulations of the United States Food and Drug Administration and

did not distribute in the United States for implantation in patients Class II medical devices that did not have FDA clearance to be distributed in the United States.

272.    Defendant Wright Medical failed to exercise ordinary care, and was negligent in that the Profemur Plasma Z Stem was a Class II Medical device and it did not have clearance from the United States Food and Drug Administration to be distributed in the United States for implantation in patients.

273.    Defendant Wright Medical failed to exercise ordinary care, and was negligent in the design, formulation, manufacture, importation, sale, testing, quality assurance, quality control, labeling, warning, marketing, promotion, and distribution of the Profemur Total Hip System in general, and the Wright Medical titanium modular neck in particular, in that Defendant Wright Medical knew or should have known the facts alleged and set forth above in this Complaint.

274.    Defendant Wright Medical additionally failed to exercise ordinary care and was negligent in testing and failing to adequately test the titanium Profemur modular necks prior to their marketing, importation, sale and distribution.

275.    Defendant Wright Medical tested its titanium Profemur modular necks for fatigue failure of the neck at the oblong taper at a weight that represented twice the body weight of a 250-pound individual, or two and one-half times the body weight of a 200-pound individual.  Yet, published scientific literature available prior to December 13, 2000 stated that routine activities such as walking may impose up to five times a person's body weight on a person's hip joint, and more strenuous but common and expected activities may impose four to eight times a person's body weight on the hip joint.

276.    Had Defendant Wright Medical adequately tested the titanium modular neck stem junction in its Profemur Hip System, it would have discovered that the neck was certain not to

withstand over time without fracture the forces that it would be subjected to in the ordinary activities of some patients that these devices were reasonably expected to be implanted in.

277.    Defendant Wright Medical was negligent in failing specifically to warn implanting surgeons, such as Theodore P. Firestone, M.D., that the titanium Profemur modular neck should not be used for active patients.

278.    Defendant Wright Medical was negligent in failing specifically to warn implanting surgeons, such as Theodore P. Firestone, M.D., that the Profemur Plasma Z Hip Stem was a Class II medical device that had not received clearance from the United States Food and Drug Administration to be distributed in the United States for implantation in patients.

279.    Defendant Wright Medical was negligent in failing to warn Plaintiff Benjamin F. Owens and his surgeon, that after the hip replacement [i.e., post-sale] that there was an increased risk the titanium necks in the implanted hip systems would fracture from metal fatigue during normal and expected use that was compared to the risk of fracture at the femoral neck of other artificial hip stems that did not use a titanium modular neck with a neck-stem joint at a similar location.

280.    Defendant Wright Medical was negligent in the choice of the titanium alloy (Ti6Al4V) for the modular neck rather than choosing a cobalt-chromium alloy, similar to that used in its femoral heads, and the neck that was a part of those heads.

281.    Defendant Wright Medical was negligent in not employing manufacturing techniques, and surface treatments to the titanium alloy (Ti6Al4V) used in the modular neck that would have increased its resistance to fretting corrosion, and reduced its risk of fracture from metal fatigue caused by cyclic loading.

282.     Defendant Wright Medical knew or had reason to know that Plaintiff Benjamin F. Owens, as a member of the general public for whose use the device was placed into interstate commerce, would be likely to use the device in a manner described in this Complaint.

283.     Defendant Wright Medical knew or reasonably should have known of the danger associated with the manner and circumstances of Plaintiff Benjamin F. Owens' foreseeable use of the device, which dangers would not be obvious to the general public.

284.     Despite the fact that Defendant Wright Medical knew or should have known that the Profemur Hip System in general, and the titanium Profemur modular neck specifically, posed a serious risk of bodily harm to consumers, Defendant Wright Medical negligently continued to manufacture and market these devices for use by consumers.

285.     Defendant Wright Medical knew or should have known that consumers such as Plaintiff Benjamin F. Owens would foreseeably suffer injury as a result of its negligence and failure to exercise ordinary care as described above, including the failure to comply with applicable federal requirements as to reporting and labeling.

286.     Defendant Wright Medical's conduct, as described above and throughout this Complaint, including, but not limited to, Defendant's inadequate design, failure to adequately test, failure to warn, misrepresentations, and false statements, as well as its continued marketing and distribution of the Profemur Hip System devices in general, and the titanium Profemur modular neck specifically, when it knew or should have known of the serious health risks these devices created and/or the failure to comply with federal reporting and labeling requirements, was negligent.

287.     As a direct and proximate result of Defendant Wright Medical's negligence, failure to exercise ordinary care, and other tortious and wrongful conduct as set forth herein, Plaintiff Benjamin F. Owens has suffered injuries and damages.

## COUNT V

## NEGLIGENCE – VIOLATION OF STATUTE/REGULATION

288.     Plaintiffs incorporate by reference the facts and allegations set forth in the paragraphs above of this Complaint.

289.     Defendant Wright Medical had and has an obligation to not violate the law in the manufacture, design, testing, assembly, inspection, labeling, packaging, supplying, marketing, selling, advertising, preparing for use, warning of the risks and dangers of the Wright Medical Profemur Hip devices, and otherwise distributing these devices.

290.     Defendant failed to obtain a 510(k) clearance prior to marketing the Profemur Z Plasma Stem for use with its titanium Profemur Modular Necks.

291.     The purpose of a 510(k) clearance, while itself not a guarantee of the safety of a device, is so that the offered predicate device is demonstrated to be the substantial equivalent of other substantially equivalent devices, that have been on the market and have a proven record of safety.

292.     The Wright Medical Profemur Z Plasma Stem in combination with the Wright Medical titanium Profemur Modular Neck is not the substantial equivalent of any 510(k) cleared device and is unsafe.

293.     The distribution of the Wright Medical Profemur Z Plasma Stem in combination with the Wright Medical titanium Profemur Modular Neck by the Defendant was a violation of Federal Regulations intended to protect the safety of consumers.

294.    The Wright Medical Profemur Z Plasma Stem in combination with the Wright Medical titanium Profemur Modular Neck without a 510(k) clearance was the marketing of an adulterated device.

295.    Defendant Wright Medical's conduct, acts and omissions, as set forth above, constitutes an adulteration, misbranding, or both, as defined by the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §§ 331(a) and 333(a)(2), and/or other yet to be determined statutes or regulations, and constitute a breach of duty subjecting Defendant Wright Medical to civil liability for all damages arising therefrom, under theories of negligence per se.

296.    Plaintiff Benjamin F. Owens, as the purchaser and ultimate intended user and consumer of the Wright Medical Profemur Hip, is within the class of persons the statutes and regulations are designed to protect, and Plaintiff's injuries are the type of harm these statutes and regulations are designed to prevent.

297.    As a direct and proximate result of Defendant Wright Medical's wrongful conduct as set forth herein, Plaintiff Benjamin F. Owens has suffered injuries and damages.

## COUNT VI

## BREACH OF EXPRESS WARRANTY BY WRIGHT MEDICAL

298.    Plaintiffs incorporate by reference the facts and allegations set forth in the paragraphs above of this Complaint.

299.    Defendant Wright Medical expressly warranted that the Profemur Total Hip System in general, and the titanium Profemur modular neck in particular, were safe and effective orthopedic devices for patients requiring a total hip arthroplasty.

300.    Wright Medical made the following express warranties, guarantees, representations, statements, and claims about its Profemur modular necks:

    a.  The modular neck used with the Profemur Hip has been employed by Wright Cremascoli for over 15 years.  The necks were designed in 1985 and have been successfully implanted in over 50,000 patients requiring both primary and revision hip procedures.  The necks are used in other Wright Cremascoli hip systems besides the Profemur Hip.  None of the necks has experienced a clinical failure since their inception.

(e.g., see: Wright Medical Technical Monograph MH688-102 © 2002, and MH688-102, REV 1204 © 2004.)

    b.  That its Conserve® and Profemur® hip products would last for 20 years.

301.    At the time Wright Medical made the statement referenced in the paragraph immediately above in a brochure it published in the year 2002, the statement, "None of the necks has experienced a clinical failure since their inception," was false.

302.    At the time Wright Medical made the statement referenced in paragraph 298, in a brochure it published in the year 2004, the statement, "None of the necks has experienced a clinical failure since their inception," was false.

303.    Wright Medical made the following express warranties, guarantees, representations, statements, and claims about its Profemur modular necks:

The modular neck system, designed by Cremascoli in 1985 (U.S. Patent # 4,957,510), has now been successfully implanted in over 50,000 patients requiring both primary and revision hip arthroplasty.  Extensive laboratory tests has proven that the coupling between the modular neck and femoral implant guarantees:

- Structural reliability
- Absence of significant micromovement
- Absence of fretting corrosion

(e.g., see: Wright Medical Technical Monograph MH688-102 © 2002, and MH688-102, REV 1204 © 2004.)

304.    At the time Wright Medical made the statement referenced in the paragraph immediately above in a brochure published in the year 2002, that statement was false.

305.     At the time Wright Medical made the statement referenced above in paragraph 301 in a brochure it published in December of 2004, that statement was false.

306.     At the time Wright Medical marketed, promoted, imported, sold and/or distributed the Profemur Hip System devices in general, and the titanium Profemur modular neck specifically, it knew that these devices were intended for human use, and Plaintiff Benjamin F. Owens was a foreseeable user of this product.

307.     The express warranties, guarantees, representations, statements, and claims made by Defendant Wright Medical was a part of the basis for Plaintiff Benjamin F. Owens' decision to use of the product and he relied on these express warranties and guarantees in deciding to use the product.

308.     The express warranties, guarantees, representations, statements, and claims made by Defendant Wright Medical was a part of the basis for Plaintiff's surgeon's decision to use of the product and he relied on these express warranties and guarantees in deciding to use the product in Plaintiff Benjamin F. Owens.

309.     At the time of the making of the express warranties, guarantees, representations, statements, and claims, Defendant Wright Medical had knowledge of the purpose for which these products would be used, and warrantied the same to be in all respects safe, effective and proper for such purpose.

310.     The Profemur Hip System devices in general, and the titanium Profemur modular neck specifically, do not conform to these express warranties, guarantees, representations, statements, and claims made by Wright Medical, as shown by the catastrophic failure of Plaintiff Benjamin F. Owens' implant.

311.    Plaintiff Benjamin F. Owens, and his implanting surgeon as the learned intermediary, each reasonably relied upon Defendant Wright Medical's express warranties, guarantees, representations, statements, and claims.

312.    Plaintiff Benjamin F. Owens used the Profemur Hip System, including the titanium Profemur modular neck for its and their intended purpose, and in a reasonably foreseeable manner.

313.    The titanium Profemur modular neck did not conform to Defendant Wright Medical's express warranties, guarantees, representations, statements, and claims because there had been clinical failures of the modular necks by fracture of the neck before the device was sold or distributed for implantation in Plaintiff.

314.    The Profemur Hip System devices in general, and the titanium Profemur modular neck specifically, did not conform to Defendant Wright Medical's express warranties, guarantees, representations, statements, and claims because the titanium Profemur modular neck structurally failed and caused serious injury to Plaintiff Benjamin F. Owens when used as recommended and directed.

315.    As a direct and proximate result of Defendant Wright Medical's breach of express warranties, Plaintiff Benjamin F. Owens has suffered and will continue to suffer injuries, damages and losses, and is entitled to compensatory damages in an amount to be determined by the trier of fact.

## COUNT VII

## WANTON AND RECKLESS CONDUCT

316.    Plaintiffs incorporate by reference the factual background set forth in the paragraphs above of this Complaint.

317.    The acts of Defendant Wright Medical was attended by circumstances of malice, or willful and wanton conduct, and/or in reckless disregard of the consequences from which malice may be inferred, and showed a total disregard for human life and human suffering.  This conduct included, but was not limited to:

a.    putting on the market for distribution and implantation in patients in the United States a Class II medical device without obtaining clearance from the United States Food and Drug Administration to do so;

b.    designing, manufacturing, exporting, importing, distributing, marketing and selling for human implantation an artificial hip that was not designed to withstand the forces that it would be subjected to in the activities of daily living;

c.    designing, manufacturing, exporting, importing, distributing, marketing and selling for human implantation an artificial hip that was not manufactured to withstand the forces that it would be subjected to in the activities of daily living;

d.    designing, manufacturing, exporting, importing, distributing, marketing and selling for human implantation an artificial hip that was not tested to withstand the level of the loads and forces it would be subjected to in the activities of daily living;

e.    designing, manufacturing, exporting, importing, distributing, marketing and selling for human implantation an artificial hip that was not designed to withstand the activities and forces that it was marketed and promoted to be able to be subjected to;

f.    once fractures of modular necks from metal fatigue were known to be occurring for more than three years, and more than 30 in number, not ceasing to export, import, distribute, market and sell for human implantation an artificial hip that was not designed to withstand the forces that it would be subjected to in the activities of daily living;

g.    once fractures of modular necks from metal fatigue were known to be occurring for more than three years, and more than 30 in number, not ceasing to export, import, distribute, market and sell for human implantation an artificial hip that was not designed to withstand the forces that it would be subjected to in the activities that Wright promoted this device as being appropriate for;

h.    once fractures of modular necks from metal fatigue were known to be occurring for more than three years, and more than 30 in number, not informing patients that such events were occurring, and why they were occurring, so that the recipients of these devices may take such steps as were necessary to adjust their

activities, or protect themselves so as to minimize the risk that their device would fail;

i.  once fractures of modular necks from metal fatigue were known to be occurring for more than three years, and more than 30 in number, not informing surgeons who had implanted these devices that such events were occurring, and why they were occurring, and the numbers and rates at which they are occurring, so they would know to inform their patients and advise them to take such steps as were necessary to adjust their activities, or protect themselves so as to minimize the risk that their device would fail;

j.  once fractures of modular necks from metal fatigue were known to be occurring for more than three years, misleading Wright Medical customers with a letter as to the number and frequency of modular neck fractures that were known to be occurring, and misstating the level, degree, and description of those who were now known by Wright Medical to be at an increased risk of suffering a modular neck fracture;

k.  once it became clear that titanium Profemur modular neck fractures were occurring in significant numbers to patients other than "heavy-weight males, long modular necks, and patient activities such as heavy lifting and impact sports," not informing surgeons who had implanted these devices that such events were occurring, why they were occurring, and the numbers and rates at which they are occurring;

l.  once it became clear that titanium Profemur modular neck fractures were occurring in significant numbers to patients other than "heavy-weight males, long modular necks, and patient activities such as heavy lifting and impact sports," not informing surgeons who had implanted these devices that such events were occurring, why they were occurring, and the numbers and rates at which they are occurring, so surgeons who had implanted these devices could make informed decisions as to how to inform their patients and advise them to take such steps as were necessary to adjust their activities, or protect themselves so as to minimize the risk that their device would fail;

m.  when fractures of its modular necks did occur, and emergency revision surgery was performed on patients using Wright Medical components in revision, charging patients, hospitals, and third-party payors Wright Medical's full list price for any Wright Medical components used in the emergency revision surgery, and thereby making a profit; and,

n.  placing continued revenue and profits from the sale of these devices above the concern for patient safety.

318.  The willful and wanton conduct of Defendant Wright Medical was conduct purposefully committed which Defendant Wright Medical must have realized as dangerous, done

heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly Plaintiff Benjamin F. Owens.

319.    To this day Defendant Wright Medical has continued its conduct and behavior, as set forth in this civil action, in a willful and wanton manner, against other persons who have these defective titanium Profemur modular necks.

320.    Defendant Wright Medical, when it had the opportunity to do so, repeatedly failed to correct a known dangerous condition regarding its medical device at issue, the Profemur Hip System devices in general, and the titanium Profemur modular neck specifically.

## DAMAGES FOR ALL CAUSES OF ACTION

321.    Plaintiffs hereby incorporate by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and for their damages for each cause of action further allege as follows:

322.    As a direct and proximate result of the failure of the Wright Medical Profemur Hip system with the titanium Profemur modular neck, and the conduct, actions, inactions and omissions of Defendant Wright Medical, Plaintiff Benjamin F. Owens has sustained injuries and damages that have a value in excess of $75,000, exclusive of interest and taxable costs, including, but not limited to:

      a.   serious and permanent physical injuries to bone, muscle, tendons, tissues and nerves in his hip and pelvis;

      b.   undergoing surgery to remove and replace the failed components and repair the damage that failure caused;

      c.   past and future pain, suffering, and anguish, both in mind and in body;

      d.   physical disability, past and future;

      e.   physical impairment, past and future;

    f.   disfigurement;

    g.   loss of enjoyment of life, past and future;

    h.   medical bills associated with replacement surgery, therapy, and recovery there from, past and future;

    i.   future surgery, medical bills and expenses; and,

    j.   attorneys' fees and the costs and expenses of litigation as may be permitted by statute.

323.    As a direct and proximate result of the defective Wright Medical Profemur Hip System with the titanium Profemur modular neck, and the conduct, actions, inactions and omissions of Defendant Wright Medical, Plaintiff Cynthia A. Owens has suffered the loss of consortium of her husband, Benjamin F. Owens.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Benjamin F. Owens and Plaintiff Cynthia A. Owens each demand judgment in an amount in excess of $75,000, prejudgment interest, post-judgment interest, and taxable cost, along with any and all other relief available under the law to fully compensate them for their injuries and damages.

## PLAINTIFFS DEMAND A TRIAL BY JURY

Respectfully submitted this 18th day of November 2020.

                *s/ George E. McLaughlin*
                George E. McLaughlin
                McLaughlin Law Firm, P.C.
                1890 Gaylord Street
                Denver, CO 80206-1211
                720-420-9800
                GEM@mcllf.com
                *Attorney for Plaintiffs*
                *Benjamin F. Owens and Cynthia A. Owens*